■ MIA PLAZA, an Infant, by Her Mother and Natural Guardian, CLARIBEL RODRIGUEZ, Appellant, v NEW YORK HEALTH AND HOSPITALS CORPORATION (JACOBI MEDICAL CENTER), Respondent. [949 NYS2d 25]—

We affirm dismissal of the complaint, but for reasons other than those stated by the motion court. Specifically, we find that the complaint should have been dismissed because plaintiff failed to comply with the 90-day time period specified in General Municipal Law § 50-e, which is a condition precedent to maintaining an action against HHC (*see Plummer v New York City Health & Hosps. Corp.*, 98 NY2d 263, 267 [2002]).

Initially, we note that plaintiff first served a notice of claim without leave of court on June 5, 2006. Plaintiff's mother began her prenatal care with defendant in late 2002, and the infant was born on July 11, 2003. Plaintiff's bill of particulars states that the acts of alleged malpractice occurred between November 27, 2002 and July 16, 2003. Therefore, the time to file a notice of claim without leave of court expired on October 16, 2003, approximately two years and eight months prior to plaintiff's attempted filing of a late notice of claim.

On April 29, 2009, defendant moved for summary judgment dismissing the complaint. That motion raised, for the first time, plaintiff's failure to file a timely notice of claim. On August 17, 2009, plaintiff filed opposition to the motion and cross-moved

for an order deeming the notice of claim timely served nunc pro tunc or, in the alternative, granting leave to serve a late notice of claim.

We have repeatedly held that service of a late notice of claim without leave of court is a nullity (*see e.g. McGarty v City of New York*, 44 AD3d 447, 448 [2007]; *Croce v City of New York*, 69 AD3d 488 [2010]). Moreover, the failure to seek a court order excusing such lateness within one year and 90 days after accrual of the claim requires dismissal of the action (*id.*). Therefore, the complaint should have been dismissed on this ground alone.

Contrary to the position of the dissent, however, plaintiff has failed to meet the basic criteria that would warrant the exercise of this Court's discretion to permit her to file a late notice of claim. General Municipal Law § 50-e (5) gives a court the discretion to grant leave to serve a late notice of claim after considering "whether the public corporation or its attorneys . . . acquired actual knowledge of the essential facts constituting a claim within the time specified in subdivision one . . . or within a reasonable time thereafter" (*see Caminero v New York City Health & Hosps. Corp. [Bronx Mun. Hosp. Ctr.]*, 21 AD3d 330, 332 [2005]). "In deciding whether a notice of claim should be deemed timely served under General Municipal Law § 50-e (5), the key factors considered are 'whether the movant demonstrated a reasonable excuse for the failure to serve the notice of claim within the statutory time frame, whether the municipality acquired actual notice of the essential facts of the claim within 90 days after the claim arose or a reasonable time thereafter, and whether the delay would substantially prejudice the municipality in its defense. Moreover, the presence or absence of any one factor is not determinative' " (*Velazquez v City of N.Y. Health & Hosps. Corp. [Jacobi Med. Ctr.]*, 69 AD3d 441, 442 [2010], *lv denied*, 15 NY3d 711 [2010], quoting *Matter of Dubowy v City of New York*, 305 AD2d 320, 321 [2003]).

As discussed below, in applying these criteria to this case, we find that plaintiff failed to provide a reasonable excuse for the delay and to establish that HHC had actual notice of the claim.

While we agree with the dissent that the statute is remedial in nature and should be liberally construed (*Camacho v City of New York*, 187 AD2d 262, 263 [1992]), such construction should not be taken as *carte blanche* to file a late notice of claim years after the incident which gave rise to the claim occurred. Such an interpretation would frustrate the purpose of the statute which is to protect the municipality from unfounded claims and

ensure that it has an adequate opportunity to explore the claim's merits while information is still readily available (*Matter of Porcaro v City of New York*, 20 AD3d 357, 357-358 [2005]).

## Reasonable Excuse

As the dissent acknowledges, plaintiff failed to offer a reasonable excuse for the delay in moving for leave to serve a late notice of claim. The record shows that the delay is attributable to the fact that plaintiff's mother, while on notice of the infant's condition, lacked an understanding of the legal basis for the claim, and that she retained her current counsel in July 2005, almost two years after the infant's birth. However, ignorance of the law is not a reasonable excuse (*see Rodriguez v New York City Health & Hosps. Corp. [Jacobi Med. Ctr.]*, 78 AD3d 538, 538-539 [2010], *lv denied* 17 NY3d 718 [2011]; *Harris v City of New York*, 297 AD2d 473, 473 [2002], *lv denied* 99 NY2d 503 [2002]). Significantly, it must be noted that counsel waited almost a year after being retained to file a notice of claim, albeit without leave of the court. Although, as the dissent points out, this factor, standing alone, does not require denial of the cross motion, it does not stand in plaintiff's favor.

## Actual Knowledge of the Essential Facts

Actual knowledge of the essential facts is an important factor in determining whether to grant an extension and should be accorded great weight (*Matter of Kaur v New York City Health & Hosps. Corp.*, 82 AD3d 891, 892 [2011]).

Contrary to the dissent's argument, plaintiff failed to demonstrate that defendant acquired actual notice of the facts constituting the claim from the medical record, as "[t]he record alone did not put defendant on notice of alleged malpractice that might years later give rise to another condition" (*Rodriguez*, 78 AD3d at 539; *Velazquez*, 69 AD3d at 442).

Here, although plaintiff's experts seize on entries discussing "fetal distress" and view the delivery and the natal intensive care unit records with the hindsight of later developed medical conditions, they fail to address the simple fact that, from all appearances, the infant was a well baby post-delivery. Her Apgar scores were eight at one minute, and nine at five minutes, with a perfect score being 10, and a normal range of 8-10. While the infant did experience respiratory distress when her oxygen saturation level decreased to 85%, after staff administered oxygen, the levels improved in short order to 92% and, afterwards to 100%. Moreover, the fetal heart rate fluctuations were not so dramatic as to give an indication that something

was amiss. While in natal ICU to rule out sepsis, the infant was described as "alert, responsive, normal muscle tone, Moro reflex symmetric, strong suck, strong cry" and the chart noted that "respiratory distress subsided." At discharge, the infant was again described as alert and responsive, strong grasp and demonstrated no apparent issues. In fact, during well-baby checkups in July and September 2003, the baby was doing well and meeting developmental milestones. The records from those visits noted a genetic issue that was corrected and was unrelated to her later problems.

Simply put, despite plaintiff's experts' attempts to read into the records issues that developed beyond the time frame set forth in plaintiff's bill of particulars, the records do not, on their face, demonstrate a failure to provide proper prenatal and labor care, or that defendant departed from good and accepted medical practice during delivery (*see Perez v New York City Health & Hosps. Corp.*, 81 AD3d 448 [2011]; *Matter of Kelley v New York City Health & Hosps. Corp.*, 76 AD3d 824, 828 [2010]).

"Merely having or creating hospital records, without more, does not establish actual knowledge of a potential injury where the records do not evince that the medical staff, by its acts or omissions, inflicted any injury on plaintiff during the birth process" (*Williams v Nassau County Med. Ctr.*, 6 NY3d 531, 537 [2006]).

Although the dissent argues *that Williams* is distinguishable from the present case, its facts are quite similar. There, plaintiff claimed his epilepsy and developmental difficulties were the result of malpractice committed by doctors and staff during his birth in September 1993 (*id.* at 535-536). Ten years later, on September 5, 2003, plaintiff's counsel sent defendants a notice of claim (*id.* at 536). There, as here, there were difficulties encountered during the delivery. The Apgar scores of the infants in both cases were identical (*see id.*). The experts in both cases claimed that the records, on their face, gave the defendants actual notice of the essential facts constituting malpractice. Also of note is the fact that subsequent medical examinations did not reveal any abnormalities until years after the incidents giving rise to the claimed malpractice.

In affirming the dismissal of the complaint in *Williams*, the Court of Appeals made the following observation: "The hospital's records reveal that the delivery was difficult, but that when it was over there was scant reason to identify or predict any lasting harm to the child, let alone a developmental disorder or epilepsy. The infant's Apgar scores were satisfactory, and even two years later, his EEG was normal. Under these circum-

stances defendants could well have concluded that when plaintiff left the hospital there was nothing wrong with him beyond a broken clavicle" (*id.* at 537). The Court when on to hold: "The relevant inquiry is whether the hospital had actual knowledge of the facts—as opposed to the legal theory—underlying the claim. Where . . . there is little to suggest injury attributable to malpractice during delivery, comprehending or recording the facts surrounding the delivery cannot equate to knowledge of facts underlying a claim" (*id*). Such is the situation here.

The dissent relies on *Perez* (81 AD3d 448), "a case factually and procedurally similar to this case," for the proposition that the medical records "on their face, evince[ ]defendant's failure to provide the infant's mother with proper prenatal and labor care" (*id.*). However, the only similarity between *Perez* and this case lies in the fact that both plaintiffs provided affirmations from experts that incorporated records and reports made well beyond the time frame of the claimed malpractice. Factually, the present case could not be more different than *Perez*.

In *Perez*, the medical records before the court were replete with heartbeat irregularities and variable decelerations "denoting compression of head or umbilical cord." There was a noted fetal intestinal discharge which was another indication of severe in utero problems. Additionally, the records show that the fetus's growth rate was below normal. The baby was born with an Apgar score of six, below the normal score, and was of small birth weight. Significantly, these records also revealed that the infant was born with respiratory distress, as well as possible ischemic brain injury due to blood loss from mechanical obstruction of blood vessels. While in the natal ICU, the records revealed, among other things, that the infant demonstrated diminished muscle tone, poor oxygen saturation which did not improve, a rapid heartbeat, concave abdomen, diaphragm abnormality diagnosed as possibly chromosomal, a short thorax, decreased muscle mass, and, most significantly, evident developmental delay. The infant spent his first 20 months of life on a ventilator and was transferred to a specialized facility for various forms of therapy. We found, not surprisingly, that under these circumstances, the medical records did in fact apprise defendants of the essential facts underlying the claimed malpractice (81 AD3d at 449).

Although defendants in *Perez* did not submit expert affidavits in response to those submitted by plaintiff (*id.*), the case before us stands in a different procedural posture. *Perez* involved a motion to file a late notice of claim. Here, the application was made by a cross motion and plaintiff's experts were essentially

responding to the affidavits of defendant's experts which were submitted in support of defendant's motion for summary judgment.

The dissent argues at great length that the medical records, as interpreted with the benefit of hindsight by plaintiff's expert, clearly showed departures from accepted medical practice and hence, gave defendant actual notice of the alleged malpractice. This fails to take into account the affidavits of defendant's experts which utilized those same records to support their conclusion that there was no departure from accepted medical procedures. In essence, the dissent is making a credibility determination that malpractice did, in fact, occur and that defendant was aware of such malpractice. This sidesteps the threshold issue in this case, i.e., whether plaintiff meets the criteria that would permit the filing of a late notice of claim (*see Caminero*, 21 AD3d at 332; *Velazquez*, 69 AD3d at 442).

Simply put, the medical records in this case do not rise to the level required for a finding that defendant's own records "equate to knowledge of facts underlying a claim" (*Williams*, 6 NY3d at 537).

## Substantial Prejudice

As previously discussed, defendant did not have actual knowledge of the facts underlying plaintiff's claims. Proof of actual knowledge, or lack thereof, "is an important factor in determining whether the defendant is substantially prejudiced by such a delay" (*Williams*, 6 NY3d at 539).

However, defendant has failed to show substantial prejudice beyond claiming unavailability of witnesses. No averment has been made that any witness is actually unavailable. Beyond a general claim that the delay has created prejudice, defendants have not shown this to be the case.

## Infancy

Finally, as the dissent concedes, plaintiff's infancy carries little weight, because there is no connection between the infancy and the delay in moving to file the late notice of claim (*see Williams*, 6 NY3d at 538).

In applying all the factors which must be considered in determining whether permitting service of a late notice of claim would be a provident exercise of discretion, we conclude that plaintiff failed to meet the overall requirements and the complaint must therefore be dismissed.

In light of our decision, we need not address plaintiff's

remaining arguments. Concur—Tom, J.P., Friedman, Sweeny and DeGrasse, JJ. Moskowitz, J., dissents in a memorandum as follows:

Moskowitz, J. (dissenting). Plaintiff's mother, Claribel Rodriguez, alleges that defendant New York City Health and Hospitals Corporation (Jacobi Medical Center) (HHC) departed from accepted standards of medical practice while caring for her during the birth of her daughter, infant plaintiff Mia Plaza, resulting in the infant's developmental delays and seizures. In my view, the motion court should have denied defendant's motion for summary judgment based upon existing factual issues. Further, it is my view that the medical records provided defendant with actual knowledge of the facts constituting plaintiff's claim and that the motion court should have granted plaintiff's cross motion to deem her late notice of claim timely. Thus, I respectfully dissent.

On December 3, 2002, the mother, then 33, began her prenatal care at Jacobi. Her estimated due date was June 27, 2003. Her prenatal care was uncomplicated until July 3, 2003, at which time she was past her due date. During an examination on July 3, Jacobi conducted a sonogram and biophysical profile. The results were within normal limits, except that the amniotic fluid index (AFI) was a low 5.4 centimeters. Hospital staff asked the mother to return to the clinic in two days. At the July 5 examination, the resident obstetrician described the fetal status as "reassuring" and recommended a follow-up appointment on July 7.

The mother returned to Jacobi on July 9. Staff told her that they would induce labor the next day. Accordingly, they admitted her at 6:30 p.m. on July 10, 2003. She was 42 weeks pregnant, or two weeks past her estimated due date.

At 7:00 p.m. Jacobi staff admitted the mother to the labor and delivery unit and attached her to a fetal heart monitor. During labor, the fetal monitor recorded fluctuations in the fetal heart rate (FHR). The monitor first recorded late decelerations[1] in the FHR at 7:53 p.m. on July 10. The next morning, July 11, at 10:10 a.m., staff administered Pitocin to induce labor. Between the time Jacobi staff admitted the mother and the time she gave birth to the infant, weighing 7 lbs., 15 oz., at 10:06 p.m. on July 11, 2003, the mother became increasingly

---

**1.** Late decelerations: "any transient fetal bradycardia, with onset of d. at the peak of the uterine contraction and nadir as contraction finishes; may represent uteroplacental insufficiency" (Stedman's Medical Dictionary 496 [28th ed 2007). Bradycardia: "Slowness of the heartbeat, usually defined (by convention) as a rate under 50 beats/minute" (id. at 208).

dilated and the fetus moved progressively downward. Jacobi staff expected a normal delivery.

At birth, delivery room staff described infant plaintiff as "floppy" and "sluggish." Thus, staff called a physician's assistant (PA) from the Pediatrics Department. The PA arrived three to four minutes after birth, after staff had placed the infant on a radiant warmer and were administering blow-by oxygen.[2] In her affidavit, plaintiff mother noted that the infant was pale at birth and did not cry. The PA found that the infant had "good tone" and "normal resp[iratory] effort." Jacobi records attributed the infant's initial sluggish condition to the staff's administration of Demerol to plaintiff mother during labor. In general, the PA's "impression" was of a "well" female infant, and Jacobi staff transferred the infant to the well-baby nursery. An initial blood gas reading at four hours of life was within normal limits.

At about 5:00 a.m. on July 12, approximately seven hours after birth, the infant experienced respiratory distress, as her oxygen saturation level on room air decreased to 85%. The nursery staff promptly administered blow-by oxygen, and her oxygen saturation level increased to 92% and later to 100%. Around that time, staff transferred the infant to the Neonatal Intensive Care Unit (NICU) to rule out sepsis[3] and for observation because of the respiratory distress.

After NICU staff admitted the infant at 5:57 a.m. and conducted a physical examination, they listed "fetal distress" as a complication of labor. Nonetheless, staff described the infant as "alert, responsive, normal muscle tone, Moro reflex symmetric, strong suck, strong cry." The NICU chart noted that the infant's "respiratory distress subsided." Staff started her on two antibiotics, pending the results of the sepsis work-up that subsequently came back negative. When plaintiff mother saw the infant in the NICU on July 12, she noticed that the infant's forehead was "indented, while the right side was bulging." By early afternoon, staff took the infant off oxygen, and she was breathing room air, with oxygen saturation levels over 95%. Over the next few days, staff noted that the infant had intermittent rapid breathing. On July 13, the infant developed mild jaundice. Staff treated her with phototherapy to decrease her

---

**2.** "Blow-by" oxygen is delivered by fitting the patient with a mask, as opposed to fitting a patient with a nasal cannula that fits into the nostrils.

**3.** Sepsis: "The presence of various pathogenic organisms, or their toxins, in the blood or tissues" (Stedman's Medical Dictionary 1749 [28th ed 2007]).

bilirubin[4] level. By July 15, 2003, the infant showed no more signs of respiratory distress and maintained her body temperature. That day, when staff discharged the infant from the NICU, the jaundice was resolving. Staff described her as alert and responsive, normal muscle tone, strong cry and positive grasp. The Jacobi discharge summary listed "fetal distress" as a labor complication. Because the infant's bilirubin level was still somewhat high, staff asked plaintiff mother to bring the infant back within 24 hours. Plaintiff mother returned with the infant, and Jacobi staff found the bilirubin levels within the acceptable range.

At Jacobi well-baby checkups on July 28 and September 12, 2003, doctors found the infant's condition, including her developmental milestones, normal for her age. At the September 12 checkup, however, doctors noted ptosis, or drooping of the left eyelid, and recorded on her chart that a first cousin also had the condition. Doctors eventually surgically corrected the ptosis. Infant plaintiff's primary care physician at the Jacobi well-baby checkups found that her head was slightly smaller than normal and diagnosed her with microcephaly.[5]

On March 16, 2009, a pediatric neurologist found the infant's head circumference in the second percentile. Plaintiff mother testified that the infant's head was misshapen for the first three months of her life. The mother testified that she corrected this condition by placing a cap on the infant's head overnight for about two months and that the infant had no significant medical history until she was five months old, other than the congenital ptosis and microcephaly.

On December 13, 2003, plaintiff mother found the infant lying in her crib with a vacant expression on her face. She was twitching and limp, and her eyes were staring to the left. She did not respond when her mother called to her, as the infant typically did. Plaintiff mother called an ambulance that transported the infant to the emergency room of Our Lady of Mercy Medical Center. While there, the infant had a seizure, and staff noted that she had a "bulging anterior fontanelle." A CT scan of her head was negative. Hospital staff diagnosed the infant with seizures and possible sepsis. That same day, staff transferred the infant to Westchester County Medical Center (Westchester), where she remained until December 19, 2003.

---

4. Bilirubin: "A yellow bile pigment found as sodium bilirubinate (soluble), or as an insoluble calcium salt in gallstones" (Stedman's Medical Dictionary 218 [28th ed 2007]).

5. Microcephaly: "Abnormal smallness of the head" (Stedman's Medical Dictionary 1205 [28th ed 2007]).

Staff treated her with Phenobarbital for the seizures. Doctors never determined the cause of the seizures. On December 14, 2003, Westchester staff performed tests, including a lumbar puncture, an MRI, a CT scan and blood tests, all of which were normal. An EEG, however, revealed that the left side of the infant's brain was slower than the right.

The Westchester medical records show that plaintiff mother described the infant as previously healthy and stated that the infant had had no respiratory distress. The infant tested positive for a flu virus, and she had a fever. An attending neurologist described the infant's condition as "S/P [status post] encephalitis [secondary] to viral infection."[6] Staff eventually discharged the infant from Westchester on December 19, 2003, with a prescription for Phenobarbital.

Plaintiff mother testified that after the seizure, the infant regressed in her development and lost certain skills, including trying to roll over. Physicians at Jacobi and Westchester informed the mother that seizures could interfere with her mental development and learning ability, as could the anti-seizure medication.

On April 28, 2005, defendant Jacobi performed an MRI on the infant. Dr. Einat Blumfield, a pediatric radiologist/neurologist at Jacobi, reported that "the hippocampal formations are symmetric and normal in size[;] however, they both exhibit high FLAIR and T2 signals." He opined that "[b]ilateral symmetric abnormal signals within the hippocampal formations may represent transient postictal [that is, post-seizure] changes."

On November 7, 2005, Dr. Alan Shanske, a pediatrician and clinical geneticist at Jacobi, evaluated the infant. Dr. Shanske noted that the infant's injuries were "[l]ikely secondary to hypoxic ischemic encephalopathy [HIE]"[7] and not genetic.

Jacobi doctors diagnosed the infant with global developmental delays, when she was approximately nine months of age, and her mother enrolled her in an early intervention program. She received services including speech, physical and occupational therapy. She eventually attended first grade at a public school, receiving special education and related services.

In July 2005, plaintiff retained counsel in connection with bringing a medical malpractice action. On June 5, 2006 (almost three years after infant plaintiff's birth), although the statutory

---

**6.** Encephalitis: "Inflammation of the brain" (Stedman's Medical Dictionary 633-634 [28th ed 2007]).

**7.** Hypoxic ischemic encephalopathy: "generally permanent brain injury resulting from a lack of oxygen or inadequate blood flow to the brain" (Stedman's Medical Dictionary 636 [28th ed 2007]).

deadline had passed (*see* General Municipal Law § 50-c), plaintiff served a late notice of claim on defendant without leave of court. On January 2, 2007, plaintiff filed the summons and complaint against defendant and two physicians. Plaintiff later discontinued the action against the individual defendants.

In its answer, defendant did not assert plaintiff's failure to serve a timely notice of claim as an affirmative defense. The parties engaged in discovery, including a General Municipal Law § 50-h hearing and the depositions of the mother and one of the physicians plaintiff had named as a defendant.

On April 29, 2009, almost three years after plaintiff served the notice of claim, defendant moved for summary judgment dismissing the complaint under CPLR 3212. Defendant argued that plaintiff could prove neither departure from the standard of care nor that defendant's treatment proximately caused infant plaintiff's injuries. Defendant further argued, in the alternative, that the court should dismiss the complaint because plaintiff failed to serve a timely notice of claim (General Municipal Law § 50-e).

In support of its motion, defendant submitted affirmations from the following physicians: Henry K. Prince, M.D., a board-certified OB/Gyn; Lance Parton, M.D., a board-certified pediatrician sub-certified in neonatology; Robert Zimmerman, M.D., a physician board-certified in diagnostic radiology, with a subspecialty certification in neuroradiology; and Kwame Anyane-Yeboa, M.D., a physician board-certified in clinical genetics and pediatrics, with a specialty in pediatric genetics.

Dr. Prince opined that defendant did not depart from the appropriate standard of care. He noted that defendant properly induced plaintiff mother's labor at 42 weeks gestation, labor proceeded normally and testing ensured fetal well-being. Regarding the FHR, the occasional variable decelerations were of no moment in light of the overall reassuring FHR. As for the moderate to severe decelerations during the last half hour before the infant's birth, labor progressed normally, ruling out the need for a cesarean section. Finally, Dr. Prince opined that the infant's excellent Apgar scores[8] at birth and her post-natal condition "effectively rule[d] out" hypoxic-ischemic injury.

Dr. Parton opined that, had the infant suffered a hypoxic event just before birth, blow-by oxygen would not have suf-

---

**8.** Apgar score: "evaluation of a newborn infant's physical status by assigning numerical values (0 to 2) to each of 5 criteria: heart rate, respiratory effort, muscle tone, response stimulation, and skin color; a score of 8-10 indicates the best possible condition" (Stedman's Medical Dictionary 1735 [28th ed 2007]).

ficiently treated her. Further, while the infant suffered mild respiratory distress, her oxygen saturation level decreased only to 85% and quickly recovered to 92% after she received blow-by oxygen. He concluded that this respiratory distress was not severe or prolonged enough to cause permanent injury. He further opined that the infant's Apgar scores at one minute and five minutes after birth established that the infant had not suffered hypoxic ischemic encephalopathy (HIE).

After reviewing the December 2003, January 2004, April 2004 and April 2005 CT scans and MRIs of the infant's brain, Dr. Zimmerman opined that the films did not reveal any brain injury or abnormality or any indication of hypoxia. He reported that any hypoxic insult would manifest through damage to the white matter of the brain and would be visible on the films. He also opined that the studies effectively ruled out hypoxic-ischemic injury around the time of the infant's birth.

Finally, Dr. Yeboa agreed that the infant had suffered no hypoxic-ischemic injury at birth. If she had, she would have exhibited developmental delays before five months of age. Rather, Dr. Yeboa opined that the infant's various symptoms, including microcephaly, suggested a genetic disorder.

In opposition, plaintiff submitted the affirmations of Bruce Halbridge, M.D., a board-certified OB/Gyn; and Dr. Rosario Trifiletti, M.D., a physician board-certified in pediatrics and neurology. Dr. Halbridge reported that he disagreed with some of Dr. Prince's conclusions. He opined that the Jacobi staff departed from good and accepted practice by failing to properly respond to signs of fetal distress apparent from the fetal heart monitor tracings. Further, Dr. Halbridge noted, on July 3, 2003, plaintiff's AFI was only 5.4 centimeters (below the third percentile), "constituting severe oligohydramnios,"[9] suggesting placental insufficiency. Dr. Halbridge opined that defendant departed from accepted practice simply by asking plaintiff to return in two days. Dr. Halbridge further opined that FHR decelerations indicated a cesarean section.

On November 11, 2006 and August 12, 2009, Dr. Trifiletti conducted neurological examinations of the infant. He opined that the infant's developmental delays and seizures were "the sequelae of perinatal HIE [hypoxic ischemic encephalopathy]." He reported that the infant "had typical clinical and radiologic findings of a child with perinatal HIE." Dr. Trifiletti further opined that the April 2005 MRI did show bilateral hippocampal

---

**9.** Oligohydramnios: "The presence of an insufficient amount of amniotic fluid (Stedman's Medical Dictionary 1362 [28th ed 2007]).

abnormalities. This opinion conflicted with Dr. Zimmerman, who found no abnormalities on the film. Further, Dr. Trifeletti concluded that those abnormalities did not arise from the infant's then-recent seizure. Rather, he opined that they showed HIE caused actual permanent damage to the hippocampi at birth.

Dr. Trifeletti also disagreed with defendant's physicians' conclusions. For example, he disputed Dr. Parton's opinion that the sequelae of intrapartum HIE would have been apparent in the delivery room or NICU. Rather, Dr. Trifeletti stated, "[It is] well understood in pediatric neurology that injury to brain structures . . . are frequently not detectable well beyond the neonatal period." Dr. Trifeletti also opined that, while umbilical cord blood was sent to the lab, no blood gas analysis appears in the records. Thus, there is no way to determine the level of blood gas values at birth.

By notice dated August 17, 2009, plaintiff cross-moved for an order pursuant to General Municipal Law § 50-e (5) deeming the late notice of claim timely served nunc pro tunc or, in the alternative, permitting her to serve and file a late notice of claim.

The motion court granted defendant's motion. Finding that defendant was entitled to summary dismissal of plaintiff's medical malpractice claim, the court did not reach the notice of claim issue. The court reasoned that the parties' papers demonstrated that plaintiff could not prove causation. The decision stated that "had the infant experienced brain damage as a result of [HIE], the CT scans and MRIs taken in December 2003, January 2004, April 2004 and April 2005 all would exhibit injury to the brain." The court concluded that "the infant's normal head scans taken in the months subsequent to her birth prove that the care and treatment rendered by [defendant] was not a proximate cause of her injury." Relying on Dr. Zimmerman's opinion, the court also found that "[h]ad the hippocampi been damaged at or around the infant's birth, it would have exhibited atrophy in the April 2005 films."

Medical Malpractice

Plaintiff argues that defendant was not entitled to summary judgment because evidence in the record demonstrates that issues of fact preclude this relief. Indeed, plaintiff maintains that the motion court erred in resolving those issues of fact, rather than simply identifying them.

Defendant satisfied its prima facie burden on its motion. Thus, the burden shifted to plaintiff (*see Bacani v Rosenberg*, 74 AD3d 500, 502 [2010], *lv denied* 15 NY3d 708 [2010]). In op-

position, plaintiff raised triable issues of fact related to defendant's departure from accepted standards of medical practice and causation (*see Frye v Montefiore Med. Ctr.,* 70 AD3d 15, 24 [2009]). Although defendant disputes Dr. Trifeletti's findings and opinion, the doctor based his opinion on infant plaintiff's medical records. Thus, his opinion is not speculative simply because he has less experience than defendant's expert, Dr. Zimmerman (*see Ashton v D.O.C.S. Continuum Med. Group,* 68 AD3d 613, 614 [2009]; *Boston v Weissbart,* 62 AD3d 517, 518 [2009]).

However, in granting defendant's motion, the court appeared to give more weight to Dr. Zimmerman's affirmation than to Dr. Trifeletti's, based on the physicians' years of experience ("According to the affirmation of Dr. Robert D. Zimmerman, an expert neuro-radiologist with over thirty seven years of medical experience, if the infant had experienced any sort of hypoxic brain damage at birth or during the neonatal period, the [CT/MRI] film would not have been normal"). For example, in addressing the dispute over atrophy in the infant's hippocampi, the court states: "[E]ven if, *arguendo,* the 2005 MRI indicates brain damage, which Dr. Zimmerman opines could have resulted from the electrical activity by the infant's recurrent seizures, the damage was so recent it had yet to cause atrophy to the infant's brain. Had the hippocampi been damaged at or around the infant's birth, it would have exhibited atrophy in the April 2005 films."

This conclusion by the court is an accurate rendition of Dr. Zimmerman's opinion. However, the motion court does not acknowledge that Dr. Trifiletti directly disputed this opinion, stating, "I [ ] disagree with the statements in [the] Zimmerman Reply [Affirmation] that imply that atrophy (not just signal intensity) is the *sine qua non* of a perinatal hypoxic-ischemic injury." Dr. Trifiletti, citing an article from a medical journal, reported that "hippocampal atrophy is a common but not a necessary feature of HIE seen on MRI two years after birth." Thus, the record does not contain a proper basis for the motion court's conclusion that the absence of atrophy necessarily rules out hypoxic injury. To the contrary, that the parties' experts disagree on this issue precludes summary judgment (*see Florio v Kosimar,* 79 AD3d 625, 626 [2010]).

Similarly, both Drs. Halbridge and Trifiletti disagree with defendant's experts on other matters. For example, the significance of the infant's Apgar scores and the conclusions they drew from the absence of cord blood gas readings. Drs. Prince and Parton concluded that infant plaintiff's Apgar scores ruled

out birth asphyxia. However, Dr. Trifiletti opined that they did not, as those scores did not measure higher cortical function, nor were satisfactory scores inconsistent with moderate hypoxic-ischemic insult. Further, defendant's experts noted that the infant did not evince brain injury immediately following birth, and therefore, could not have sustained hypoxic injury. Citing medical journal articles, Dr. Trifiletti disputed this conclusion, noting that a relatively benign newborn course is not inconsistent with intrapartum brain injury.

Moreover, the motion court accepted and incorporated into its decision Dr. Zimmerman's opinion, even though he disagreed with defendant's own medical staff interpretations. For example, the motion court accepted Dr. Zimmerman's opinion that brightness on one of the infant's MRI's was simply normal brightness of a hippocampal MRI. In contrast, Jacobi's Dr. Blumfield found that "the hippocampal formations are symmetric and normal in size[;] however, they both exhibit high FLAIR and T2 signals" that might represent post-seizure changes.

In another example, while the motion court accepted Dr. Zimmerman's finding that the infant had not suffered a hypoxic ischemic injury at birth, it ignored a defendant treating doctor's report that the infant's "[n]eurological impairment . . . [was] [l]ikely secondary to hypoxic ischemic encephalopathy." Thus, even one of defendant's own doctors supported plaintiff's contention that HIE caused the infant's injuries.

Accordingly, I would reverse on this issue.

Late Notice of Claim

As noted above, because the motion court granted defendant's motion for summary judgment, it did not reach plaintiff's cross motion for an order deeming timely her late service of the notice of claim or, alternatively, leave to serve a late notice of claim.

"All actions sounding in medical malpractice brought against HHC . . . are subject to the notice of claim provision, and the notice of claim must be filed within 90 days after the claim arises" (*Plummer v New York City Health & Hosps. Corp.*, 98 NY2d 263, 267 [2002]; General Municipal Law § 50-e [1] [a]). The statute's intent is to protect the municipality from unfounded claims and ensure that it has an adequate opportunity to explore the claim's merits while information is still readily available (*see Matter of Porcaro v City of New York*, 20 AD3d 357, 357-358 [2005]). However, courts should liberally construe the statute because it is remedial in nature (*Camacho v City of New York*, 187 AD2d 262, 263 [1992]), as it is not intended to operate as a way to frustrate the rights of those with legitimate claims (*see Porcaro*, 20 AD3d at 357-358).

Under General Municipal Law § 50-e (5), a court has discretion to grant leave to serve a late notice of claim after considering, "in particular, whether the public corporation or its attorney or its insurance carrier acquired actual knowledge of the essential facts constituting the claim within [90 days] or within a reasonable time thereafter." That section further provides that the court must consider "all other relevant facts and circumstances, including: whether the claimant was an infant, or mentally or physically incapacitated . . . and whether the delay in serving the notice of claim substantially prejudiced the public corporation in maintaining its defense on the merits" (General Municipal Law § 50-e [5]; *see also Caminero v New York City Health & Hosps. Corp. [Bronx Mun. Hosp. Ctr.]*, 21 AD3d 330, 332 [2005]). The key factors in evaluating whether to permit a late notice of claim are: "[1] [W]hether the movant demonstrated a reasonable excuse for the failure to serve the notice of claim within the statutory time frame, [2] whether the municipality acquired actual notice of the essential facts of the claim within 90 days after the claim arose or a reasonable time thereafter, and [3] whether the delay would substantially prejudice the municipality in its defense. Moreover, the presence or absence of any one factor is not determinative" (*Velazquez v City of N.Y. Health & Hosps. Corp. [Jacobi Med. Ctr.]*, 69 AD3d 441, 442 [2010], *lv denied* 15 NY3d 711 [2010], quoting *Matter of Dubowy v City of New York*, 305 AD2d 320, 321 [2003] [internal citations omitted]).

1. Actual Knowledge

Plaintiff argues that, based on the affirmations of Drs. Trifiletti and Halbridge, the medical records gave defendant actual notice of the essential facts constituting the claim within the statutory time frame, in spite of the almost three-year delay in serving the notice of claim. In response to plaintiff's cross motion, defendant's experts do not address the issue of whether the medical records provided defendant with actual notice. Instead, defendant contends that if its experts offer a plausible explanation for infant plaintiff's injuries other than malpractice, it has successfully "refuted" plaintiff's claim of actual knowledge. This argument has no basis in law.

That defendant simply generated or possessed medical records surrounding the infant's delivery does not inexorably lead to the conclusion that it acquired actual knowledge of the facts underlying the claim, unless there is some basis on the face of the records that defendant had reason to believe that the treatment at issue would lead to a future condition arising from malpractice at the birth (*see Williams v Nassau County Med. Ctr.*, 6

NY3d 531, 537 [2006]; *Velazquez*, 69 AD3d at 442-443). Actual knowledge of the essential facts is an important factor in determining whether to grant an extension, and courts should accord it great weight (*see Matter of Kaur v New York City Health & Hosps. Corp.*, 82 AD3d 891, 892 [2011]).

In his affirmation, Dr. Trifiletti specifically opines that the "FHM [fetal heart monitor] strips," that show the heart monitor's recordings of "late decelerations and prolonged periods of severely diminished fetal heart rate variability[,] . . . reflect moderate HIE." He further opines that, "in the context of the labor complications" [Jacobi] staff listed in the medical records, the infant's "sluggishness and poor feeding . . . provide[ ] additional notice to [defendant] that the infant had sustained intrapartum injury."

In his report, dated February 1, 2007, that he incorporates into his affirmation, Dr. Trifiletti states that the "[f]etal heart monitoring records . . . show signs of prolonged and progressive fetal distress and persistent variable decelerations that should have been of some concern." He further states that, by the early afternoon of July 11, 2003, "there are late and variable decelerations which are of sufficient severity to warrant a Cesarean section." Finally, he opines that "peripartum brain damage could have been avoided in this case by the expeditious performance of a Cesarean section (at latest) in the early afternoon of [July 11, 2003]."

Dr. Halbridge opines in his affirmation that the Jacobi medical records "show that its staff first departed from good and accepted practice by delaying the plaintiff mother's admission for induction of labor and later, after labor was induced, by failing to deliver by cesarean section in the presence of clear signs of fetal compromise that appeared on the FHM tracings." He further opines that the "fetal heart monitor tracings plainly reveal fetal distress in the form of severely diminished variability and persistent late decelerations when there was no sound reason to continue labor induction rather than delivery by c-section." Referring to infant plaintiff's low AFI on July 3, 2003, Dr. Halbridge opines that defendant's "plan simply to have the mother return for a repeat [biophysical profile] was a departure from accepted practice in the presence of oligohydramnios, a sign of deteriorating placental function and an increased risk factor for umbilical cord compression once labor commences . . . This analysis is not changed by the fact that the AFI subsequently increased. AFI's can fluctuate widely and oligohydramnios, particularly in a post dates pregnancy, should not be ignored. On July 3, 2003 accepted practice required admitting the mother for induction of labor."

Moreover, following his genetic evaluation of infant plaintiff on November 7, 2005, even Jacobi's Dr. Shanske reported that the infant's "[n]eurological impairment . . . [was] [l]ikely secondary to hypoxic ischemic encephalopathy." Thus, as Dr. Trifiletti described in his affirmation, "[Jacobi's] own treating physician concluded . . . that perinatal HIE was the most probable cause of the infant's condition."

Defendant's expert affirmations, in support of defendant's motion for summary judgment, opine that no malpractice occurred. However, these affirmations do not address the import of the fetal distress records or counter plaintiff's experts and the treating physician's opinion as to notice. The majority's conclusion that I have made a credibility determination is therefore misplaced.

Here, unlike the *Williams* case, where the records did not "suggest injury attributable to malpractice during delivery" and the plaintiff's delay in filing the late notice of claim was a far lengthier 10 years (6 NY3d at 537), the Jacobi medical records, as plaintiff's expert affirmations demonstrate, "on their face, evince[ ] defendant's failure to provide the infant's mother with proper prenatal and labor care" (*Perez v New York City Health & Hosps. Corp.*, 81 AD3d 448, 448 [2011]; *see Lisandro v New York City Health & Hosps. Corp. [Metropolitan Hosp. Ctr.]*, 50 AD3d 304, 304 [2008] ["plaintiff submitted affirmations from physicians establishing that the available medical records, on their face, evinced that defendants failed to provide the infant plaintiff with proper care"], *lv denied* 10 NY3d 715 [2008]; *Talavera v New York City Health & Hosps. Corp.*, 48 AD3d 276, 277 [2008] ["Plaintiffs submitted affirmations from a physician establishing that the medical records, on their face, evince that defendant failed to provide proper care to plaintiffs"]).

While the majority attempts to liken the case before us to *Williams*, in that case, the infant's seizures did not develop until the age of one or two. Here, infant plaintiff's seizures emerged a mere five months after her birth and, as the record demonstrates, while she was still under the care of defendant. Moreover, the Court of Appeals found "influential" the plaintiff's 10-year delay in filing a notice of claim (*Williams*, 6 NY3d at 538).

In *Perez*, a case factually and procedurally similar to this case, the plaintiff submitted two expert affirmations and the "defendant did not submit any expert affirmations to challenge the conclusions of [the] plaintiff's medical experts" on this issue (81 AD3d at 449).

While the majority strives to distinguish *Perez* from the case before us, it is directly on point. The crux of the plaintiff's claim there was that, approximately one month before the infant's birth, the defendant failed to conduct tests, in light of indications of lack of growth, that resulted in the failure to diagnose the fetal problems and the consequent failure to induce delivery that may have prevented some of the infant's injuries. Similarly, here, one of plaintiff's central claims, as Dr. Halbridge opines in his affirmation, is that in light of the low AFI recorded eight days before the infant's birth, indicating severe oligohydramnios, defendant failed to immediately induce labor and later, after labor was induced, failed to perform a cesarean section in response to the FHM tracings.

Moreover, contrary to the majority's position, the procedural posture of *Perez* is no different from that in the case before us. In *Perez* the plaintiff filed a motion for leave to serve a late notice of claim and, in this case, plaintiff filed a cross motion. In both cases, the defendant had the opportunity to respond to the plaintiff's experts on the issue of whether the medical records provided the defendant with actual notice and, in both cases, the defendant failed to do so.

Consequently, as in *Perez*, the evidence in the record is sufficient to provide defendant with " 'actual notice of the facts—as opposed to the legal theory—underlying [plaintiff's] claim' " (81 AD3d at 448, quoting *Williams*, 6 NY3d at 537).

2. Prejudice

Defendant claims that it was prejudiced as a result of plaintiff's delay in serving the notice of claim, in that its employees who had personal knowledge have left defendant, and their memories have substantially faded. Plaintiff contends that any prejudice is negligible, because the trial court will try the case primarily on the medical records.

A defendant's lack of actual knowledge of the facts underlying the claim is necessarily an aspect of prejudice. By this standard, defendant has not been prejudiced because its medical records provided it with actual notice, as previously discussed. Moreover, defendant has failed to show substantial prejudice as a result of the claimed unavailability of witnesses. Defendant neither avers nor shows that any physician is actually unavailable (*see Lisandro*, 50 AD3d at 304; *Greene v New York City Health & Hosps. Corp.*, 35 AD3d 206, 207 [2006]). Indeed, the parties already deposed the resident obstetrician in the matter. Thus, while a long delay may give rise to an inference of prejudice, the almost three-year delay here, like that in *Perez*, was not especially long, and plaintiff carried the burden of showing that material witnesses are available.

3. <u>Infancy</u>

Plaintiff asserts that the child's infancy weighs in favor of granting her application. As the Court of Appeals held in *Williams*, infancy is one factor the court must consider. However, "[t]he lack of a causative nexus between the delay and plaintiff's infancy is not fatal by itself" (*Lisandro*, 50 AD3d at 304). Where there is no causal nexus between the infancy and plaintiff's late service, the factor lends little support for late filing. Here, as in *Williams*, the infancy has no such nexus. Thus, plaintiff's infancy has minimal impact on the determination to grant or deny the cross motion.

4. <u>Reasonable Excuse</u>

As plaintiff accurately notes, absence of an acceptable excuse for the delay alone does not compel denial of her application (*see Matter of Ansong v City of New York*, 308 AD2d 333, 334 [2003]). Here, plaintiff has not offered a reasonable excuse for her delay in serving the notice of claim. However, we have previously held that "the lack of a reasonable excuse is not, standing alone, sufficient to deny an application for leave to serve and file a late notice of claim," where the public corporation had actual notice of the essential facts and was not prejudiced by the delay (*Renelique v New York City Hous. Auth.*, 72 AD3d 595, 596 [2010]; *see also Bayo v Burnside Mews Assoc.*, 45 AD3d 495, 495 [2007] ["Although the stated ignorance of the law by infant plaintiff's mother is not a reasonable excuse . . . , infant plaintiff should not be deprived of a remedy, where, as here, the record evidence demonstrates that [defendants'] possession of the medical records sufficiently constituted actual notice of the pertinent facts, and that they would not be substantially prejudiced by the delay"]).

On balance and weighing all the key factors, had the motion court reached the issue, in my view, it should have granted plaintiff's cross motion.

Accordingly, I would also reverse on this issue. Concur—Tom, J.P., Friedman, Sweeny, Moskowitz and DeGrasse, JJ.